597 P.2d 280

STATE of New Mexico,
Plaintiff-Appellee,

v.

William A. MANUS,
Defendant-Appellant.

No. 11879.

Supreme Court of New Mexico.

May 4, 1979.

Rehearing Denied May 21, 1979.

Jack Smith, Albuquerque, Pickard & Singleton, Sarah Michael Singleton, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Charlotte H. Roosen, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

EASLEY, Justice.

The jury found William Manus guilty of first degree murder, attempted first degree murder and aggravated assault. Consecutive sentences were imposed. Manus appeals. We affirm.

Manus raises issues of:

1.  substantial evidence of deliberate intent;

2.  sufficiency of evidence to submit the charge of aggravated assault;

3.  failing to instruct the jury on voluntary manslaughter;

4.  consecutive sentences as double jeopardy;

5.  admissibility of statements made by the defendant;

6.  admission of pretrial statements of witnesses;

7.  allowing a rebuttal witness to testify without allowing further discovery and investigation; and,

8. warrantless search of defendant's clothing.

The following facts are not in dispute. The victim, Officer Wasmer, had stopped Mrs. Manus for driving violations, had arrested her and placed her in the back seat of his police car. This occurred nearly in front of the Manus' home. Lesher had stopped to report that her truck had been sideswiped a short time before. Wasmer was filling out an accident report with the help of Lesher. Switzer, a member of the Bosque Farms Patrol who was with Wasmer, was standing in front of the Lesher vehicle which had pulled up behind the police car. Manus approached the vehicle from the front carrying a loaded shotgun. Wasmer died from injuries inflicted as a result of the discharge of Manus' shotgun.

There is conflicting testimony concerning events at the immediate scene. Manus testified that he had taken the shotgun out of his house and had gone to some outbuildings to investigate what he thought were prowlers. He said he approached the police car with the intention of reporting the suspected prowlers. He was blinded by the lights, and the next thing he remembered was being shot, staggering and sitting down.

Lesher testified that she looked up and saw a man with a shotgun in front of Mrs. Manus' car, that the man said, "Just go on and put the car in the driveway." Wasmer then said, "Put down the gun." The man did not put down the gun, but pointed the shotgun in the direction of Lesher and Wasmer. She then testified that she ducked behind her truck door and heard two shots. When she looked up, she observed that Wasmer had been shot, and the ·man with the shotgun was pointing it at Switzer. She testified that Switzer told her to go to the end of the block and get help, and that he was trying to get the man to drop his gun. When she returned, the man was sitting on the ground. Lesher found shotgun pellet marks in the door and on the top of her truck.

Switzer testified that he observed someone running toward them, and when the person was about 15 feet away, Switzer noticed that he had a gun. He pointed the gun at Switzer, who then yelled, "He's got a gun", and ducked behind the car. He heard two shots. He drew his gun and ran to the back of the car, where he saw the man with the shotgun run to the front of the car and again point the gun at him. Switzer fired at the man, who then dropped his gun and said, "I will get you, too."

Cole, a neighbor of Manus, testified that he arrived at the scene and was rendering first aid to Manus. He testified that Manus made the following statement: "I was drunk. Stupid thing. Just a stupid thing. The Bosque Farms police stopped my wife. I got angry and went and got my gun." Faust, another neighbor of Manus, testified that he also was rendering first aid. He testified that Manus said, "I have done a stupid, stupid thing." He further testified that Manus appeared shaken and upset, but that he apparently knew what had happened and what was going on at the time.

Finally, there was testimony that the police, soon after the incident, discovered two boxes of shotgun shells and some loose shells scattered on top of a table in Manus' home.

*Evidence of Premeditation—Deliberate Intent*

In determining whether substantial evidence was presented to support charges, an appellate court must view the evidence in the light most favorable to the State and indulge all reasonable inferences which support the conviction. *State v. Lankford*, 92 N.M. 1, 582 P.2d 378 (1978). The direct evidence shows that Manus killed Wasmer. The evidence was circumstantial on the element of deliberate intent. Since the element of intent involves the state of mind of the defendant it is seldom, if ever, susceptible to direct proof, and may be proved by circumstantial evidence. *State v. Ferrari*, 80 N.M. 714, 460 P.2d 244 (1969); *State v. Smith*, 76 N.M. 477, 416 P.2d 146 (1966). A verdict of not guilty should be directed only when there are no reasonable inferences or sufficient surrounding circum-

stances from which to infer intent. *State v. Ortiz*, 90 N.M. 319, 563 P.2d 113 (Ct.App. 1977).

■ From the evidence set out above, the jury could reasonably infer deliberation and premeditation. Manus' statement that he got angry when the police stopped his wife is evidence of motive. His statement that he went and got his gun, and the testimony of shotgun shells loose on his table next to boxes of shells, is evidence which the jury could infer manifested a plan or design. When coupled with the testimony of the witnesses at the scene concerning the action and conduct of Manus, there was clearly sufficient evidence to submit the charge of first degree murder to the jury and to support the jury's verdict of guilty thereon.

■ With regard to the attempted murder in the first degree of Switzer, there is also sufficient evidence to support the submission of the charge and the verdict thereon. The testimony shows that Manus twice aimed his shotgun at Switzer, who had to seek cover, and that Manus told Switzer, "I'll get you, too."

*Intent Requirement in Aggravated Assault Charge*

■ Manus argues that his conviction for the aggravated assault of Lesher cannot stand because there was no evidence of any intentional assault directed at Lesher. Three recent cases have addressed this issue. *State v. Cutnose*, 87 N.M. 307, 532 P.2d 896 (Ct.App.1974), *cert. denied*, 87 N.M. 299, 532 P.2d 888 (1974); *State v. Mascarenas*, 86 N.M. 692, 526 P.2d 1285 (Ct.App.1974); *State v. Cruz*, 86 N.M. 455, 525 P.2d 382 (Ct.App.1974). Each held that a general criminal intent is required to support a conviction for aggravated assault.

The court below gave N.M.U.J.I.Crim. 1.50, N.M.S.A.1978 as to the elements of aggravated assault, and also instructed on general criminal intent.

■ The State was not required to prove that Manus intended to assault Lesher, but only that he did an unlawful act which caused Lesher to reasonably believe

that she was in danger of receiving an immediate battery, that the act was done with a deadly weapon, and that it was done with a general criminal intent. §§ 30-3-1 & 2, N.M.S.A.1978; *Cutnose, supra.* There is substantial evidence to support the conviction of aggravated assault.

*Necessity for Instruction on Voluntary Manslaughter*

■ Manus argues that it was reversible error for the court to fail to instruct on voluntary manslaughter. Manus tendered an instruction conforming with N.M.U.J.I. Crim. 2.20, N.M.S.A.1978. The uniform instruction reads, in pertinent part, "In the case of voluntary manslaughter the defendant kills after having been sufficiently provoked, . . . . The provocation must be such as would affect the ability to reason and cause a temporary loss of self control in *an ordinary person of average disposition.*" (Emphasis added). Manus was entitled to an instruction on voluntary manslaughter only if there was some evidence in the record to support it. *State v. Riggsbee*, 85 N.M. 668, 515 P.2d 964 (1973); *State v. Ulibarri*, 67 N.M. 336, 355 P.2d 275 (1960).

■ The general rule is that, in order to reduce murder to manslaughter, the victim must have been the source of the defendant's provocation. 1 R. Anderson, *Wharton's Criminal Law and Procedure*, § 276 (1957); 1 O. Warren & B. Bilas, *Warren on Homicide*, § 92 (1938); 40 C.J.S. *Homicide* § 53 (1944). We therefore review the record to determine if there is some evidence that Wasmer provoked Manus. We must also ask whether there is sufficient evidence that the provocation was such as to cause a temporary loss of self control in an ordinary person of average disposition.

■ The key facts in favor of Manus are that Wasmer had stopped Mrs. Manus and, when Manus approached the scene with his shotgun, a shot was fired from behind the lights of the stopped cars. Up to the time when the first shot was fired, there is nothing to indicate that Wasmer was not rightfully and lawfully exercising his duties.

The exercise of a legal right, no matter how offensive, is no such provocation as lowers the grade of homicide. [*State v. Lawry*, 4 Nev. 161 (1868); *State v. Craton*, 28 N.C. (6 Ired.L.) 133 (1845)].

 .        .        .        .        .

If the defendant intentionally caused the victim to do acts which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked. In such case, the circumstances show that he acted with malice aforethought, and the offense is murder. (Footnote omitted).

1 R. Anderson, *supra* at 587. A law enforcement officer performing lawful acts in the discharge of his duty is engaged in the exercise of a legal right. Acts of a peace officer exercising his duties in a lawful manner cannot rise to the level of sufficient provocation. *People v. Roman*, 256 Cal. App.2d Supp. 656, 64 Cal.Rptr. 268 (Ct.App. 1967). *See also Suhay v. United States*, 95 F.2d 890 (10th Cir. 1938), *cert. denied*, 304 U.S. 580, 58 S.Ct. 1060, 82 L.Ed. 1543 (1938); *State v. Nolan*, 354 Mo. 980, 192 S.W.2d 1016 (1946).

If Wasmer fired the first shot, was this evidence of sufficient provocation to cause an ordinary person to kill under the circumstances? Was Wasmer exercising reasonable and necessary force, or exercising unreasonable, and therefore, excessive force?

> Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace. When acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court.

*Mead v. O'Connor*, 66 N.M. 170, 173, 344 P.2d 478, 479–80 (1959).

The State's evidence showed that Manus was angry about the officer stopping his wife, got his shotgun, loaded it, approached the scene in a trot with the loaded gun, had some words with the officers, refused to put his shotgun down when told to do so, pointed the shotgun at Switzer, and ultimately fired at Wasmer, after which he threatened that he would "get" Switzer also.

Manus testified that he did not know that Mrs. Manus was stopped at the scene, that he had approached the police vehicle with his shotgun to report prowlers, that he was blinded by the lights, that he was shot at from behind the lights, and that the next thing he remembered was sitting or falling down. He did not remember discharging his shotgun. He did not present any other evidence of sufficient provocation for killing Wasmer.

> [T]here may be "some evidence" of a lesser offense even though this depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other points in dispute. (Citations omitted.)

*Belton v. United States*, 127 U.S.App.D.C. 201, 207, 382 F.2d 150, 155 (1967).

Had the jury been instructed on voluntary manslaughter, the only way they could have returned a verdict of guilty on that charge would have been to accept Manus' testimony up to the point where Wasmer fired at him from behind the lights, and reject the rest of Manus' testimony; then to accept the State's evidence that Manus pointed his gun at Wasmer and shot him, disregarding the majority of the State's remaining evidence of the events at the scene.

> [D]espite the jury's broad authority in treating the proofs, the selective process must not be so attenuated as to strain credulity to the breaking point. Among the inquiries we deem relevant when the legitimacy of the process is at stake are whether there must be extensive picking and discarding of evidence, whether the ultimate finding necessitates fragmentation of testimony in such degree as to distort it, and whether facts not supported by proof must be supplied. (Footnote omitted.)

*Brooke v. United States*, 128 U.S.App.D.C. 19, 24, 385 F.2d 279, 283 (1967).

■ In the case before us, in order to convict of voluntary manslaughter, the jury would have had to fragment the testimony of Manus to such a degree as to distort it. The entire line of his testimony was exculpatory; he indicated no heat of passion or sufficient provocation. The jury would have had to speculate to supply these elements. While we recognize that whether a police officer exercised reasonable force depends on all the circumstances of the case and is normally a jury question, *Mead, supra,* it is nonetheless the defendant's burden to come forward with evidence establishing sufficient provocation in order to be entitled to an instruction on voluntary manslaughter as a lesser included offense. *See Smith v. State,* 89 N.M. 770, 558 P.2d 39 (1976). We find no evidence that Officer Wasmer was acting unlawfully or used excessive force, and no evidence of provocation such as would cause a loss of self control in an ordinary person of average disposition. We therefore hold that there was no evidence of sufficient provocation to warrant instructing the jury on voluntary manslaughter.

## Double Jeopardy

Manus argues that principles of double jeopardy prohibit consecutive sentences under the circumstances of this case. He alleges that all three convictions arose out of a set of acts constituting a single transaction, and therefore, consecutive sentences should not be imposed.

Manus argues that the "same transaction" test should be applied to determine whether consecutive sentences are proper. That test was rejected in *State v. Tanton,* 88 N.M. 333, 540 P.2d 813 (1975). The "same evidence" test has been adopted as the law in New Mexico. *Tanton, supra; State v. Sandoval,* 90 N.M. 260, 561 P.2d 1353 (Ct.App.1977), *cert. denied,* 90 N.M. 637, 567 P.2d 486 (1977).

■ In the case before us, different elements were required to be proved in order to sustain each of the three convictions, and different evidence was admitted to prove the different elements. Therefore, it ap-

pears that the three convictions were based in part on separate evidence. The prohibition against double jeopardy does not bar consecutive sentencing under the circumstances of this case. *Sandoval, supra.*

## Admissibility of Manus' Statements to Cole and Faust

Cole was permitted to testify, over defense objection, that Manus had said, "I got angry and went and got my gun." Faust also testified to a statement made by Manus at the scene. Manus argues that these statements were inadmissible because they were involuntary and also because they were in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Manus argues that he lacked sufficient capacity to make a voluntary statement because of his head wounds. For a statement to be voluntary, ". . . the defendant must have had sufficient mental capacity at the time he made the statement, to be conscious of the physical acts performed by him, to retain them in his memory and to state them with reasonable accuracy." *State v. Chavez,* 88 N.M. 451, 452, 541 P.2d 631, 632 (Ct.App.1975). The record furnishes substantial evidence that the *Chavez* test was met, that Manus had sufficient mental capacity at the time he made the statement, and that it was therefore voluntarily made.

■ Manus next argues that the statement should have been excluded because it was made before he had been given his *Miranda* rights. He argues that he was "in custody" at the time the statement was made, and that Cole was acting as an agent of the police. We need not determine whether Manus was "in custody" at the time, however, because it is clear that Cole and Faust were not acting as agents of the police. They volunteered to help Manus. The police did not request any assistance from Cole or Faust, and there was no intent on their part to interrogate Manus for the police. Manus had not been arrested. He cites *United States v. Brown,* 466 F.2d 493

(10th Cir. 1972), and *Commonwealth v. Bordner,* 432 Pa. 405, 247 A.2d 612 (1968). These cases are distinguishable on the facts. We hold that Manus' statement was not the result of "custodial interrogation", as that term is used in *Miranda.* The admission into evidence of these statements was not an abuse of discretion.

### Admissibility of Witnesses' Prior Consistent Statements

During the testimony of Lesher and Switzer, counsel for defendant vigorously cross-examined them regarding certain inconsistencies between their trial testimony and statements made shortly after the incident.

The prior written statements of Lesher and Switzer were admitted into evidence on the State's motion pursuant to N.M.R.Evid. 801(d)(1)(B), N.M.S.A.1978, which provides:

A statement is not hearsay if: . . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is *offered to rebut an express or implied charge* against him *of recent fabrication or improper influence or motive* . . .. (Emphasis added.)

Manus argues that it was error to admit the entire statements of the witnesses, rather than just those portions which tended to rehabilitate the witnesses with respect to the inconsistencies pointed out on cross-examination.

We acknowledge the general rule to be that, where a statement is made available to defendant for impeachment, the State may then introduce into evidence only that portion of the statement used to impeach the witness or that which explains and clarifies the same subject. *Allen v. State,* 493 S.W.2d 515, 516 (Tex.Cr.App. 1973); *Camps v. New York City Transit Authority,* 261 F.2d 320, 322 (2d Cir. 1958).

However, this principle does not aid Manus in this case. The record clearly indicates that defense counsel did not merely impeach Lesher and Switzer regarding specific inconsistencies between their trial testimony and their prior statements, but he also called into question their general credibility.

There was obviously an "express or implied charge . . . of recent fabrication or improper influence . . .." N.M.R.Evid. 801(d)(1)(B). The record does not indicate that the trial court abused its discretion in admitting the complete pre-trial statements of Lesher and Switzer in order to show the high degree of consistency those statements had with their trial testimony. *See State v. Bell,* 90 N.M. 134, 560 P.2d 925 (1977), and *United States v. Lombardi,* 550 F.2d 827 (2d Cir. 1977).

### Rebuttal Witness

Manus claims error regarding the testimony of one of the State's rebuttal witnesses, Charles Seig, whose name did not appear on the State's list of witnesses. The defense objected to his testimony on the basis of surprise. The court postponed Seig's testimony until the next day in order to allow the defense to depose Seig. Seig testified at trial and was vigorously cross-examined. He said he met Manus while in a hospital ward at the State Penitentiary and asked Manus what he was "in" for. He testified that Manus replied that he had "blown away a cop", and that he felt that he had "done the community a service." Seig's deposition revealed that there were several prisoners and a guard present at the time that Manus allegedly made these statements. Prior to Seig's testimony, the defense moved for a continuance in order to allow investigation of the other persons present at the time the alleged statement was made, to determine whether they would corroborate or contradict Seig's testimony. The court denied the continuance.

Manus argues that the prosecution was obligated to disclose prior to trial that Seig was a possible witness and that allowing Seig to testify in rebuttal, and not allowing the defense a continuance to investigate other witnesses to the statement of Manus, denied him his rights to a fair trial, to effective assistance of counsel and to present witnesses in his own defense.

The purpose of discovery in a criminal case, indeed the purpose of a trial itself, is to ascertain the truth.

A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. The current tendency in the criminal law is in the direction of discovery of the facts before trial and elimination of surprise at trial. (Footnote omitted).

*Gregory v. United States,* 125 U.S.App.D.C. 140, 144, 369 F.2d 185, 188 (1966), *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969). *See Coppolino v. Helpern,* 266 F.Supp. 930, 935–36 (S.D.N.Y. 1967). In a criminal case, "[t]he district attorney should not hesitate to show his entire file to the defendant. It is not the primary duty of the district attorney to convict a defendant. It is his primary duty to see that the defendant has a fair trial, that justice is done. *State v. Chambers,* 86 N.M. 383, 524 P.2d 999 (Ct.App.1974)." *Chacon v. State,* 88 N.M. 198, 201, 539 P.2d 218, 221 (Ct.App.1975).

This Court has not addressed the question of whether N.M.R.Crim.P. 27(b), N.M.S.A. 1978, requires the district attorney to disclose rebuttal witnesses, or whether it only requires disclosure of witnesses he intends to call in his case-in-chief. N.M.R.Crim.P. 27(b) provides:

The defendant may serve on the district attorney a request to produce a written list of the names and addresses of *all witnesses* which the district attorney *intends to call* . . .. (Emphasis added).

There is authority that the rule covers witnesses, whether in chief or in rebuttal. *People v. Manley,* 19 Ill.App.3d 365, 311 N.E.2d 593 (1974). *See also State v. Driver,* 38 N.J. 255, 183 A.2d 655 (1962).

On the other hand, many courts have held that the rule does not apply to rebuttal witnesses.

As for whether rebuttal witnesses come within the purview of the witness list requirement, the general rule seems to be that they do not, so long as the rebuttal is *true rebuttal* and not an attempt to present the state's case-in-chief in the rebuttal. (Footnote omitted; emphasis added).

*McCurry v. State,* 538 P.2d 100, 105 (Alaska 1975). *See also Rowan v. State,* 252 So.2d 851 (Fla.App.1971). The issue of what is "true rebuttal" evidence was addressed in *State v. White,* 74 Wash.2d 386, 444 P.2d 661 (1968). In that case, the Supreme Court of Washington stated:

Genuine rebuttal evidence is not simply a reiteration of evidence in chief but consists of evidence *offered in reply to new matters.* The plaintiff, therefore, is not allowed to withhold substantial evidence supporting any of the issues which it has the burden of proving in its case in chief merely in order to present this evidence cumulatively at the end of defendant's case. Ascertaining whether the rebuttal evidence is in reply to new matters established by the defense, however, is a difficult matter at times. Frequently true rebuttal evidence will, in some degree, overlap or coalesce with the evidence in chief. Therefore, the question of admissibility of evidence on rebuttal rests largely on the trial court's discretion, . . .. (Emphasis added).

444 P.2d at 667.

The circumstances of this case indicate that Mr. Seig was not a "true rebuttal" witness. The district attorney was fully aware of Seig's testimony ahead of time. Seig was transferred from the State Penitentiary to the County Jail in order that he might be present to testify. The transcript shows that Seig's testimony was not truly in rebuttal of anything Manus had presented in his defense. Rather, it appears that the district attorney asked two seemingly irrelevant questions on cross-examination of Manus, dealing solely with the alleged statements of Manus in prison, in order to set up the alleged rebuttal testimony of Seig. This type of gamesmanship in the conduct of a criminal trial is not to be commended.

The failure to disclose a witness, however, will not aid Manus unless he can show that he was prejudiced thereby. *Chacon v. State, supra; People v. Jarrett,* 22 Ill.App.3d 61, 316 N.E.2d 659 (1974). In the case now before us, Manus' counsel was given an opportunity to depose Seig prior to his testifying at trial. On the basis of information obtained through the deposition, Seig was vigorously and competently cross-examined. This opportunity to depose this surprise rebuttal witness before his testimony at trial served to remove the prejudice caused by the initial surprise. *People v. Clark,* 9 Ill.App.3d 998, 293 N.E.2d 666 (1973); *cf. Rowan v. State, supra.*

There remains the question whether the trial court should have granted a continuance to allow defense counsel to seek out and investigate other witnesses present when Manus allegedly made his statement to Seig. In the present case, we have no indication that Seig lied on the witness stand. N.M.R.Crim.P. 45(c), N.M.S.A.1978, provides for making a motion for a new trial on the ground of newly discovered evidence. Nothing prohibited defense counsel from attempting to ascertain the true facts after trial and moving for a new trial based on newly discovered evidence, if indeed his investigation would have indicated that Seig had lied. *See People v. Lott,* 66 Ill.2d 290, 5 Ill.Dec. 841, 362 N.E.2d 312 (1977).

The granting or denial of a continuance is within the sound discretion of the trial court, and in the absence of prejudice being shown, there is no basis for reversal on this point. *State v. Sanchez,* 58 N.M. 77, 265 P.2d 684 (1954).

### Warrantless Search of Defendant's Clothing

Manus argues that the court erred in admitting into evidence four shotgun shells which were discovered as the result of a warrantless search of Manus' clothing. We agree.

Manus had been taken to Presbyterian Hospital Emergency Room for treatment. His clothing had been taken from him, and Officer Chavez asked for the clothing as possible evidence in the case. The clothing was turned over by an aide at the hospital. Officer Galaviz testified that he took custody of the clothing. He further testified:

> [A]s I picked the pants up I noticed they felt heavy. I shook the pants and I could hear something in the pocket and I reached in the pocket and pulled out four shells.

The four shotgun shells were admitted into evidence over defense objection.

A warrantless search is *per se* unreasonable unless it falls within certain well-defined exceptions to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Ledbetter,* 88 N.M. 344, 540 P.2d 824 (Ct.App.1975). The State argues admissibility under three of the exceptions which were outlined in *Ledbetter*; probable cause, search incident to arrest, and inventory search.

A warrantless search may be made on the basis of probable cause and exigent circumstances. *Ledbetter, supra; State v. Sims,* 75 N.J. 337, 382 A.2d 638 (1978). The State does not argue, nor does the record support, a finding of exigent circumstances. In *Rodriquez v. State,* 91 N.M. 700, 705, 580 P.2d 126, 131 (1978), a case involving a search incident to arrest, this Court held: "Where officers have within their exclusive control personal effects belonging to the arrestee, a warrantless search of these items is illegal. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)." The record shows that Manus' clothing was within the exclusive control of the officers before that clothing was searched and the shotgun shells were found.

The State argues that the evidence was admissible as a result of an inventory search for the purpose of protecting the defendant's property. The State cites *Chavis v. Wainwright,* 488 F.2d 1077 (5th Cir. 1973). However, there was no proof that the purpose of the officer here was to inventory Manus' property. The burden

was on the State to prove this exception to the rule. This exception does not apply. In the case of *Lowe v. Hopper*, 400 F.Supp. 970, 977 (S.D.Ga.1975), aff'd, 520 F.2d 1405 (5th Cir. 1975), the court stated:

> *The burden is on the government* to show that the search is within one of the exceptions to the warrant requirements of the Fourth Amendment. (Citations omitted; emphasis added.)

> [T]he test is a . . . subjective one. *The "real purpose" of the inspection must be inventorial and nonpretextuous with an unexpected result insofar as turning up evidence is concerned.* (Emphasis added).

*See State v. Sims, supra.* The shotgun shells found during the search of Manus' clothing should not have been admitted. *Rodriquez, supra.*

 The error in admitting this evidence does not require reversal, however. Although the admission of evidence obtained in violation of certain constitutional rights requires automatic reversal, see *Miranda, supra*, the admission of evidence in violation of the Fourth Amendment, under certain circumstances, may be harmless error. In *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the United States Supreme Court held that the admission of illegally seized evidence did not require reversal so long as the error was harmless beyond a reasonable doubt. This "reasonable doubt" standard has been interpreted to mean a "reasonable possibility" that the jury would not have convicted in the absence of the improperly admitted evidence. *United States v. Smith*, 578 F.2d 1227 (8th Cir. 1978).

Which standard an appellate court selects depends on the type of case on appeal—criminal or civil—or on the type of error committed in the trial court—constitutional or nonconstitutional. If the error in the present case was "a federal constitutional error," . . . we would of course be bound to apply the reasonable possibility test. (Footnotes omitted).

*United States v. Valle-Valdez*, 554 F.2d 911, 915 (9th Cir. 1977). *See also* Saltzburg, *The Harm of Harmless Error*, 59 Va.L.R. 988 (1973).

In the face of all the other evidence of guilt and statements of Manus that he had used the gun and the shells in connection with an investigation of prowlers, it appears beyond a reasonable doubt that the jury would have reached the same verdict had those four shotgun shells not been in evidence.

We therefore affirm Manus' convictions and the sentences imposed thereon.

IT IS SO ORDERED.

SOSA, C. J., and PAYNE, J., concur.